ATTORNEYS FOR APPELLANTS
Kenneth J. Falk
Indiana Civil Liberties Union
Indianapolis, Indiana

Simon Heller
Janet Crepps
Pro Hac Vice
Center for Reproductive Rights
New York, New York

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

Thomas M. Fisher
Special Counsel

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

Anna Tooman
Law Clerk

ATTORNEYS FOR AMICI CURIAE
INDIANA CATHOLIC CONFERENCE
William J. Wood
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE
MEMBERS OF THE INDIANA GENERAL
ASSEMBLY
Eric Allan Koch
Bloomington, Indiana

Paul Benjamin Linton
Northbrook, Illinois

# In the
# Indiana Supreme Court

No. 49S05-0501-CV-31

CLINIC FOR WOMEN, INC.,

*Appellants (Plaintiffs below)*,

v.

CARL J. BRIZZI,

*Appellee (Defendant below)*.

Appeal from the Marion Superior Court, No. 49D07-0303-PL-558
The Honorable Gerald Zore, Judge

_____

**November 23, 2005**

**Rucker, Justice.**

The Indiana Legislature has passed a law that requires a woman seeking an abortion to give her informed consent prior to the procedure and, except in the case of a medical emergency, specifies that a physician (or other medical personnel) must "orally" and in her presence provide her with certain information at least 18 hours before the abortion is performed. The plaintiffs in this case contend that this law on its face violates the right to "liberty" set forth in Article I, Section 1, of the Indiana Constitution. We hold that this law is not unconstitutional because the plaintiffs cannot demonstrate that there are no set of circumstances under which the statute can be constitutionally applied. We further hold that even if the law were challenged as unconstitutional as applied in a particular case, the challenge would fail because the law does not impose a material burden on any right to privacy or abortion that may be provided or protected by Article I, Section 1.

**Background**

In <u>Roe v. Wade</u>, the United States Supreme Court held that statutes enacted by the legislatures in Texas and Georgia violated an abortion right provided and protected by the United States Constitution. 410 U.S. 113 (1973). In the intervening years, the scope of that right has been interpreted in many court decisions. One of those decisions held that the abortion right was not infringed upon by a statute enacted by the legislature in Pennsylvania that, among other things, (1) required that a woman seeking an abortion give her informed consent prior to the procedure and (2) specified that a physician "orally" provide her with certain information at least 24 hours before the abortion was performed. <u>Planned Parenthood v. Casey</u>, 505 U.S. 833, 881-87 (1992).

A few years after <u>Casey</u> was decided, the Indiana Legislature enacted the statute at issue in this case. (A federal court would later note that the text of the Indiana statute "is materially identical to one held constitutional" in <u>Casey</u>. <u>A Woman's Choice-East Side Women's Clinic v. Newman</u>, 305 F.3d 684 (7th Cir. 2002).) The Indiana statute (1) provides that a woman seeking an abortion must give her informed consent prior to the procedure, and (2) specifies that a physician (or other medical personnel) must "orally" and in her presence provide her with certain information at least 18 hours before the abortion is performed. Ind. Code § 16-34-2-1.1.[1] It is

---

[1] Indiana Code Section 16-34-2-1.1(a) provides:

> An abortion shall not be performed except with the voluntary and informed consent of the pregnant woman upon whom the abortion is to be performed. Except in the case of a medical emergency, consent to an abortion is voluntary and informed only if the following conditions are met:
>
> (1) At least eighteen (18) hours before the abortion and in the presence of the pregnant woman, the physician who is to perform the abortion, the referring physician or a physician assistant (as defined in IC 25-27.5-2-10), an advanced practice nurse (as defined in IC 25-23-1-1(b)), or a midwife (as defined in IC 34-18-2-19) to whom the responsibility has been delegated by the physician who is to perform the abortion or the referring physician has orally informed the pregnant woman of the following:
>
> (A) The name of the physician performing the abortion.
> (B) The nature of the proposed procedure or treatment.
> (C) The risks of and alternatives to the procedure or treatment.
> (D) The probable gestational age of the fetus, including an offer to provide:
>
>   (i) a picture or drawing of a fetus;
>   (ii) the dimensions of a fetus; and
>   (iii) relevant information on the potential survival of an unborn fetus;
>   at this stage of development.
>
> (E) The medical risks associated with carrying the fetus to term.
> (F) The availability of fetal ultrasound imaging and auscultation of fetal heart tone services to enable the pregnant woman to view the image and hear the heartbeat of the fetus and how to obtain access to these services.
>
> (2) At least eighteen (18) hours before the abortion, the pregnant woman will be orally informed of the following:
>
> (A) That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care from the county office of family and children.
> (B) That the father of the unborn fetus is legally required to assist in the support of the child. In the case of rape, the information required under this clause may be omitted.

often argued that one of the practical consequences of the requirement that the oral advisements be given to the woman in person 18 hours (or 24 as in Pennsylvania) before an abortion is performed is that the woman must make two trips to the facility. This has been referred to in subsequent litigation as the "in her presence" or "two trip" requirement. The "in her presence" or "two trip" requirement does not apply in the "case of medical necessity." Id.

In 1995, several health care facilities that provided abortion services and a physician who performed abortions filed suit in federal court contending that this Indiana statute violated the abortion right recognized by Roe v. Wade. Ultimately, the federal courts held that the statute did not violate the United States Constitution. See A Woman's Choice, 305 F.3d at 693.

The plaintiffs in this case include some of the plaintiffs in the federal litigation just mentioned. They filed this lawsuit in 2003, shortly after the federal litigation came to an end, seeking a permanent injunction against the enforcement of the statute. They contend that although the federal courts have held that this statute does not violate the abortion right recognized by Roe v. Wade, it was nevertheless beyond the power of the Legislature to pass this statute because it violates provisions of the Indiana Constitution. Specifically, they first maintain that the statute violates Article I, Section 1,[2] of the Indiana Constitution because it "infringes upon women's liberty interests to determine the course of their medical treatment." Second, they maintain that the statute violates both Article I, Section 1, and Article I, Section 12,[3] because it

---

> (C) That adoption alternatives are available and that adoptive parents may legally pay the costs of prenatal care, childbirth, and neonatal care.
>
> (3) The pregnant woman certifies in writing, before the abortion is performed, that the information required by subdivisions (1) and (2) has been provided.

[2] Article I, Section 1, provides:

> WE DECLARE, That all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the people; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the *people* have, at all times, an indefeasible right to alter and reform their government.

4

"infringes upon women's right to choose abortion." Third, they maintain that the statute violates Article I, Section 9,[4] because it "infringes the rights of plaintiffs and their patients to the free interchange of thought and opinion and to freedom of speech."[5]

After considering the parties' arguments, the trial court dismissed the complaint without explanation. The Court of Appeals affirmed in part and reversed in part. Clinic for Women, Inc. v. Brizzi, 814 N.E.2d 1042 (Ind. Ct. App. 2004). It rejected the plaintiffs' contention that the statute violates Article I, Section 9, and Article I, Section 12 of the Indiana Constitution. We summarily affirm those determinations. Ind. Appellate Rule 58(A)(2). And while not going so far as to hold that the statute violates Article I, Section 1, the Court of Appeals did hold that Article I, Section 1, provides "[t]he citizens of Indiana . . . a fundamental right of privacy" that includes "protection of the right to make . . . the decision to terminate pregnancy." Clinic for Women, 814 N.E.2d at 1048-49. The Court of Appeals then remanded this case to the trial court for an evidentiary hearing on whether the statute imposes "a material burden" on this right. Id. at 1050-52. Having previously granted the State's petition to transfer, we now affirm the judgment of the trial court.

**Discussion**

As the Court of Appeals acknowledged, its decision finding a "fundamental right of privacy inherent in and protected by our state constitution" has "never been explicitly stated." Clinic for

---

[3] Article I, Section 12, provides, "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."

[4] Article I, Section 9, provides, "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible."

[5] In the trial court, the plaintiffs also maintained that the statute violates Article I, Section 23, in several respects because it "is not reasonably related to inherent characteristics which distinguish a class of women making the medical decision to have an abortion from the class of all persons making other medical decisions"; "is not reasonably related to inherent characteristics which distinguish women seeking medical services from men seeking medical services"; "infringes upon the fundamental right of plaintiffs' patients to choose whether or not to continue a pregnancy"; and "impermissibly discriminates on the basis of sex." Plaintiffs do not present these claims on appeal.

5

Women, 814 N.E.2d at 1048.  The State argues to us that the fact that no such constitutional right had been stated before should have caused the Court of Appeals to infer that no such constitutional right exists.  Pet. to Transfer at 5-6.  The State further contends that Article I, Section 1, protects no judicially enforceable rights in general and does not protect a right to abortion in particular.  Id. at 3-4.  We find it unnecessary to determine whether there is any right to privacy or abortion provided or protected by Indiana's Constitution because we are of the view that (a) plaintiffs in this case have not overcome the heavy burden imposed on those challenging the facial validity of a statute, and (b) in any event, the provisions of the statute are such that they would not impermissibly impinge upon any right to privacy or right to abortion that might exist.

## I.

Both the State and the plaintiffs focus on whether Indiana Code § 16-34-2-1.1 places a "material burden" on a woman's right to make the ultimate decision to terminate her pregnancy.  This standard was first articulated in Price v. State, 622 N.E.2d 954 (Ind. 1993), where the defendant was convicted of disorderly conduct based on her statements to an arresting officer.  Although defendant Price challenged the disorderly conduct statute on grounds that it was overbroad and therefore void "on its face," id. at 958, this Court rejected that claim declaring among other things, "[u]nless the court concludes that the statute before it is incapable of constitutional application, it should limit itself to vindicating the rights of the party before it." Id.  We therefore declined to address the defendant's claim that the challenged statute was unconstitutional on its face and "turn[ed] instead to whether its application *in this case* was constitutional."  Id. (emphasis added).  On this "unconstitutional as applied" claim, we announced the "material burden" standard.  It provides in relevant part: "[T]he State may not punish expression when doing so would impose a material burden upon a core constitutional value." Id. at 960.  We elaborated:

> Rationality inquiry . . . has historically centered on whether the impingement created by the statute is outweighed by the public health, welfare, and safety served.  "Material burden" analysis involves no such weighing nor is it influenced by the social utility of the state action at issue.  Instead, we look only at the magnitude

6

> of the impairment. If the right, as impaired, would no longer serve the purpose for which it was designed, it has been materially impaired.

Id. at 960-61 n.7 (citations omitted).

With one exception, our courts have been faced with the Price "material burden" standard only in the context that certain state action is unconstitutional as applied in a given case.[6] Most cases involved claims that a disorderly conduct conviction or juvenile adjudication materially burdened a right of free speech. See Whittington v. State, 669 N.E.2d 1363 (Ind. 1996); Matter of U.M. v. State, 827 N.E.2d 1190 (Ind. Ct. App. 2005); Mitchell v. State, 813 N.E.2d 422 (Ind. Ct. App. 2004), trans. denied; Madden v. State, 786 N.E.2d 1152 (Ind. Ct. App. 2003), trans. denied, 792 N.E.2d 1152; Johnson v. State, 747 N.E.2d 623 (Ind. Ct. App. 2001); Shoultz v. State, 735 N.E.2d 818 (Ind. Ct. App. 2000), trans. denied, 753 N.E.2d 818; Johnson v. State, 719 N.E.2d 445 (Ind. Ct. App. 1999); Radford v. State, 640 N.E.2d 90 (Ind. Ct. App. 1994), trans. denied. Two involved freedom of religion claims; see City Chapel Evangelical Free, Inc. v. City of South Bend, 744 N.E.2d 443 (Ind. 2001) (church claimed city's taking of church property materially burdened right to religious exercise); Endres v. Indiana State Police, 794 N.E.2d 1089 (Ind. Ct. App. 2003) (police officer discharged from job for failure to work at casino claimed his right to religious freedom was materially burdened), affirmed in part, vacated in part, 809 N.E.2d 320 (Ind. 2004); and another apparently involved a claim of freedom of the press. In re WTHR-TV, 693 N.E.2d 1 (Ind. 1998) (defendant news stations claimed trial court order compelling disclosure of outtakes without a special showing of need and relevance materially burdened their rights to free speech).

In this case there has been no claim that Indiana Code § 16-34-2-1.1 is unconstitutional as applied to any particular plaintiff. And indeed because of this case's procedural posture, no such claim could be made. Seeking declaratory and injunctive relief, plaintiffs originally filed their complaint in the Federal District Court for the Southern District of Indiana. At the time, the statute at issue had been enacted but had not yet taken effect. The district court granted relief in

---

[6] Morrison v. Sadler, 821 N.E.2d 15 (Ind. Ct. App. 2005), trans. not sought (applying material burden standard to address plaintiffs' facial challenge to the constitutionality of the Defense of Marriage Act).

7

part and enjoined the operation of the statute. Because plaintiffs sought a pre-enforcement injunction, their constitutional challenge to the statute was by necessity a facial one. We observed as much when responding to certified questions from the district court. See A Woman's Choice-East Side Women's Clinic v. Newman, 671 N.E.2d 104, 106 (Ind. 1996) (noting that the court had certified certain questions to us "so that we may resolve a facial challenge to the abortion law's constitutionality."). The case is now before us in exactly the same posture. The only substantive difference is that rather than a facial challenge to the statute under the federal Constitution, plaintiffs now make a facial challenge to the statute under the Indiana Constitution.[7]

The federal circuit courts are in disagreement on the standard governing facial challenges to statutes under the federal Constitution. Before Casey, the standard set forth in United States v. Salerno, controlled:

> A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the [statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid . . . .

481 U.S. 739, 745 (1987) (involving a constitutional challenge to the Bail Reform Act of 1984). In Casey, the Supreme Court did not mention or cite Salerno, but rather announced a new standard: "undue burden." Under this standard a legislative enactment violates the federal Constitution if "in a large fraction of the cases in which [the statute at issue] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." Casey, 505 U.S. at 895. If the "undue burden" standard applies, then a facial challenge no longer needs to demonstrate that application of the statute results in a constitutional violation *every* time, only that application of the statute results in a constitutional violation "in a large fraction of the cases" in which the statute is relevant. Some federal circuit courts have determined the Salerno test

---

[7] In their brief before the Court of Appeals plaintiffs specifically alleged, "Ind. Code § 16-34-2-1.1(1) is unconstitutional because it impinges on a woman's right to obtain an abortion which materially burdens a core value protected by Art. I, § 1 of the Indiana Constitution." Appellants' Br. at 9.

8

continues to apply in the context of facial challenges to abortion statutes.[8]   Other circuits have determined that the "undue burden" standard applies.[9]

Whether the Salerno standard for facial challenges survives Casey for purposes of federal constitutional law is of no moment in this case.   Regardless of the standard applicable to legislative enactments challenged under the federal Constitution, this jurisdiction applies the Salerno standard to facial challenges under the Indiana Constitution.   More specifically we have determined:

> When a party claims that a statute is unconstitutional on its face, the claimant assumes the burden of demonstrating that there are no set of circumstances under which the statute can be constitutionally applied.  Although we have never explicitly said that this principle applies to state constitutional analysis as well as federal, we have suggested as much.  We now so hold.

Baldwin v. Reagan, 715 N.E.2d 332, 337 (Ind. 1999) (citations omitted) (rejecting plaintiffs' contention that the Seatbelt Enforcement Act is unconstitutional on its face).   This is a heavy burden, which the plaintiffs here have not met.

Challenging the plaintiffs' complaint, the defendants filed a motion to dismiss under Indiana Trial Rule 12(B)(6) alleging the complaint failed to state a claim under which relief can be granted.   When reviewing a motion to dismiss for failure to state a claim, this Court accepts as true the facts alleged in the complaint.   City of New Haven v. Reichhart, 748 N.E.2d 374, 377

---

[8] See, e.g., Manning v. Hunt, 119 F.3d 254, 268 n.4 (4th Cir. 1997) (noting that the Salerno test must be applied until the Supreme Court expressly overrules it); Barnes v. Moore, 970 F.2d 12, 14 (5th Cir. 1992) (holding the same).

[9] See, e.g., Planned Parenthood of Cent. N.J. v. Farmer, 220 F.3d 127, 142-43 (3d Cir. 2000) (holding the "undue burden" standard, instead of Salerno test, applies in abortion context after Casey); Women's Med. Prof. Corp. v. Voinovich, 130 F.3d 187, 193-96 (6th Cir. 1997) (holding that Casey effectively overruled Salerno); A Woman's Choice, 305 F.3d at 687 (noting that Supreme Court has yet to overrule Salerno, but in face of newer, conflicting standard, chose newer standard in abortion context); Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1456-58 (8th Cir. 1995) (opting to apply the "undue burden" test); Planned Parenthood of Arizona v. Lawall, 180 F.3d 1022, 1025-27 (9th Cir. 1999) (holding that Casey has overruled Salerno in the context of facial challenges to abortion statutes); Jane L. v. Bangerter, 102 F.3d 1112, 1116 (10th Cir. 1996) (observing that Supreme Court applied "undue burden" test in Casey instead of Salerno test).

(Ind. 2001). We view the pleadings in the light most favorable to the non-moving party, and draw every reasonable inference in favor of that party. Id. We will affirm a successful T.R. 12(B)(6) motion when a complaint states a set of facts, which, even if true, would not support the relief requested in that complaint. Id. at 377-78.

In this case, even if taken as true, the material allegations contained in the plaintiffs' complaint do not support their claim that Indiana Code § 16-34-2-1.1 is invalid on its face. The complaint alleges in pertinent part:

> Although abortion is safer than childbirth, the health risks associated with abortion increase significantly with delay. The longer women delay in obtaining abortion services, the greater the cost of the care. . . . The challenged statute will compel many women seeking abortions to delay in obtaining an abortion; to travel to a neighboring state to obtain an abortion; to carry pregnancies to term; and to pursue alternatives to legal abortion to end their pregnancies. Each of these alternatives will cause foreseeable psychological and physical harm, as well as economic and other injuries.

Appellants' App. at 14. First, the health concerns outlined in the complaint already have been addressed. The statute itself contains a medical emergency carve-out from the 18-hour waiting period. And responding to a certified question from the federal district court we held, "the statute permits immediate abortion far short of medical calamities. An attending physician may dispense with the statutory informed consent requirements when she concludes in her best clinical judgment that her patient's condition indicates an abortion is medically necessary." A Woman's Choice, 671 N.E.2d at 110.

This leaves, then, the increased cost of care that will be occasioned by the 18-hour delay and that *many* women may (i) delay obtaining abortions, (ii) travel to other states to obtain abortions, (iii) carry pregnancies to term, or (iv) seek alternatives to legal abortions. Setting aside the fact that "many" is not readily quantifiable, the fact that some unknown number of women may be adversely affected by the delay obviously means that not all or perhaps not even most will be so affected.

10

As for the increased cost of care, even assuming all women on whom the 18-hour waiting period is imposed will face economic hardship, "a law or ordinance does not violate the Constitution solely because it directly or indirectly results in economic hardship . . . ." Martin v. Stites, 203 F.Supp.2d 1237, 1251 (D. Kan. 2002) (rejecting claim that economic hardship arising out of method by which towing contracts were awarded deprived plaintiff of protected liberty interest). See also Webster v. Reproductive Health Services, 492 U.S. 490 (1989) (Court upheld constitutionality of statute requiring fetal viability testing, despite the fact that tests would increase costs of abortion by several hundred dollars).

Again, it is important to emphasize that in this facial challenge to the constitutionality of Indiana Code § 16-34-2-1.1, plaintiffs carry the burden of demonstrating that "there are *no* set of circumstances under which the statute can be constitutionally applied." Baldwin, 715 N.E.2d at 337 (emphasis added). The allegations in plaintiffs' complaint simply fail to meet this high standard. To the contrary, there certainly are circumstances under which Indiana Code § 16-34-2-1.1 can be constitutionally applied. Accordingly plaintiffs' facial challenge must fail. The trial court correctly granted defendants' T.R. 12(B)(6) motion to dismiss.

## II.

Although we are of the view that the plaintiffs' challenge to the constitutionality of Indiana Code § 16-34-2-1.1 is a facial one, we nevertheless proceed to analyze whether, if presented with a challenge to the statute as applied, there could be an issue for trial as Justice Boehm contends and the Court of Appeals held. We hold that there could not be because Indiana Code § 16-34-2-1.1 does not impose a material burden upon any fundamental right of privacy that includes protection of a woman's right to terminate her pregnancy that might exist under Article I, Section 1.

If presented with a claim that a legislative enactment or other state regulation as applied infringes upon a constitutional right, the degree of the alleged infringement will be assessed to determine whether it is constitutional. This assessment must be made using the appropriate

11

standard of review. We first address the appropriate standard for reviewing whether the statute here violates any right to privacy or right to abortion provided or protected by Article I, Section 1.

## A.

As a matter of federal constitutional law, Casey announced that the proper standard of review for the constitutionality of restrictions on the abortion right before viability would henceforth be whether "state regulation imposes an undue burden on a woman's ability to make" the decision to terminate her pregnancy. Casey, 505 U.S. at 874.

The Supreme Court explained the undue burden standard as follows:

> A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends. . . .
>
> Some guiding principles should emerge. What is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so. Regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose. Unless it has that effect on her right of choice, a state measure designed to persuade her to choose childbirth over abortion will be upheld if reasonably related to that goal.

Id. at 877-78 (citations omitted).

12

**B.**

The standard of review applicable to federal constitutional review does not control state constitutional review.[10]  As a matter of state constitutional law, Indiana courts have used a number of different standards of review, depending upon the particular constitutional right alleged to be infringed and the magnitude of it.  The most exacting of these standards has been that established in Price, 622 N.E.2d at 959 n.4, where we famously declared that a legislative enactment or government regulation would be unconstitutional if it imposed a "material burden" on a "fundamental right" that constituted a "core constitutional value."  The "core constitutional value" implicated in Price was the freedom of political expression protected by Article I, Section 9, of the Indiana Constitution.  In Price, we found that a woman's noisy protest about police conduct constituted constitutionally protected political speech and reversed her conviction for disorderly conduct.  "Subjecting the political expression of Hoosiers to this standard of gentility [polite criticism] would impose a material burden."  Id. at 963.[11]

In this case, as already stated, the Court of Appeals concluded that Article I, Section 1, contains a fundamental right of privacy, rising to the level of a "core constitutional value," that includes "protection of the right to make . . . the decision to terminate pregnancy."  Clinic for Women, 814 N.E.2d at 1049.  That being the case, the Court of Appeals said the statute would be unconstitutional if it imposed a "material burden" on that right, invoking the Price "material burden" test.  Id. (citing Price, 622 N.E.2d at 960).

In order to set to one side the question of whether the Indiana Constitution embodies a core constitutional value of privacy that includes a right to abortion, we assume the applicability

---

[10] Of course, the Supremacy Clause would prevent us from using a standard of review that would purport to validate a regulation that did not pass federal constitutional muster.

[11] We have identified "core constitutional values" in one other case.  See City Chapel Evangelical Free, Inc., 744 N.E.2d at 450 (Ind. 2001) (holding that Article I, Sections 2 and 3, "advance core values that restrain government interference with the practice of religious worship, both in private and in community with other persons").  In that case, a city sought to acquire a church's property by eminent domain.  We concluded that the church was entitled to present its claim to the trial court that the loss of its property would materially burden its rights embodied in the core values.  Id. at 450.  As such, we did not engage in material burden review ourselves.

13

of the Price "material burden" standard where the petitioners bring an as applied constitutional challenge to a statute.

Price declared that "[a] right is impermissibly alienated when the State materially burdens one of the core values which it embodies." Id. at 960. "Material burden" analysis does not involve weighing nor is it influenced by the social utility of the state action at issue. City Chapel Evangelical Free, Inc., 744 N.E.2d at 447 (citing Price, 622 N.E.2d at 960 n.7). As enunciated in Price, we look only at the magnitude of the impairment. If the right, as impaired, would no longer serve the purpose for which it was designed, it has been materially impaired. Id. The Court in Whittington v. State elaborated on these points: "[S]tate action does not impose a material burden on expression if either the 'magnitude of the impairment' is slight, or the expression threatens to inflict 'particularized harm' analogous to tortious injury on readily identifiable private interests." 669 N.E.2d at 1370 (citations to Price omitted).[12]

## C.

We find the operation and effect of the "material burden" standard of Price and "undue burden" standard of Casey to be virtually indistinguishable for purposes of this analysis. Both tests avoid weighing the relative interests of the constitutional right and of the state regulation at issue in the case. Instead, they measure the extent to which the state regulation impinges upon the central principle that the constitution protects.

In Casey, that central principle—"[w]hat is at stake"—is "the woman's right to make the ultimate decision" to terminate her pregnancy. A regulation would be unconstitutional, i.e., it would impose an undue burden, if it had "the effect of placing a substantial obstacle in the path of a woman's choice." This is so even if the regulation "further[s] the interest in potential life or some other valid state interest." Casey, 505 U.S. at 877.

---

[12] Like Price, Whittington was an appeal of a conviction for disorderly conduct, based on Whittington's loud speaking during a police investigation. Unlike Price, Whittington's conviction was affirmed. The speech in Price was "political," thereby implicating a "core constitutional value" and triggering material burden review. We held the speech in Whittington not to be political and, therefore, not subject to material burden review. Whittington, 669 N.E.2d at 1370.

14

Under Price, the central principle is "the purpose for which [the core constitutional value] was designed." It seems apparent that if there is a core constitutional value of privacy implicated here, the purpose for which it is designed is a woman's right to make the ultimate decision to terminate her pregnancy—the same central principle at stake in Casey. A regulation would be unconstitutional, i.e., it would impose a material burden, if it has the effect of "the right, as impaired, . . . no longer serv[ing] the purpose for which it was designed," Price, 622 N.E.2d at 961 n.7; in this case, no longer permitting a woman to make the ultimate decision to terminate her pregnancy.

Price's more abstract language can be read to give the State somewhat more regulatory leeway than does Casey. Price can be read to say that a state regulation would constitute a material burden only if it totally blocked the path of a woman's choice—if it made it so that the right no longer served the purpose for which it was designed—whereas a regulation could fail Casey's undue burden test short of total blockage merely by placing a substantial obstacle in that path. We think this reading would incorrectly lessen Price's mandate. It is true, as Price says, that the material burden test is failed if a state regulation totally blocks the purpose for which the constitutional right was designed. But Price does not foreclose a lesser impairment also constituting a material burden. We believe and hold that a state regulation creates a material burden if it imposes a substantial obstacle on a core constitutional value serving the purpose for which it was designed; and we hold that in most circumstances, less than a substantial obstacle does not.

More broadly, we hold that Price's material burden test is the equivalent of Casey's undue burden test, at least for purposes of assessing whether a state regulation violates any fundamental right of privacy that may include protection of a woman's right to terminate her pregnancy that might exist under Article I, Section 1, of the Indiana Constitution.

**III.**

As previously noted, material burden review has only been applied to claims regarding the freedom of political expression protected by Article I, Section 9, of the Indiana Constitution.

15

The cases in which those claims arose are of little assistance in analyzing whether the statute at issue here would constitute a material burden to any fundamental right of privacy that includes protection of a woman's right to terminate her pregnancy that might exist under Article I, Section 1. But we do have the benefit of the decisions of a number of other courts assessing whether the same or similar statutes constituted undue burdens upon a woman's constitutional right to terminate her pregnancy.

First and foremost among them is Casey. In that case, the federal district court had found the Pennsylvania 24-hour waiting period requirement to be unconstitutional. Justices O'Connor, Kennedy, and Souter delivered a joint opinion that has come to be viewed as "the Supreme Court's dominant view." See Roger B. Dworkin, Limits 43 (1996). In it, the Justices concluded that "the essential holding of Roe v. Wade should be retained . . . ." Casey, 505 U.S. at 846. It then announced, as noted above, that the proper standard for review is "undue burden," id. at 874, that is, whether a provision of law's "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Id. at 877.

When the Justices turned their attention to the waiting period requirement, they found that, "in theory," it was "a reasonable measure to implement the State's interest in protecting the life of the unborn, a measure that does not amount to an undue burden." Id. at 885. The Justices then considered whether the waiting period requirement was "nonetheless invalid because in practice it [was] a substantial obstacle to a woman's choice to terminate her pregnancy." They deemed this to be "a closer question," in part because "the practical effect" of the waiting period meant that "a woman seeking an abortion [must] make at least two visits to the doctor." While the Justices found to be troubling the findings of the district court that the waiting period requirement would be "particularly burdensome," they held that the requirement did "not demonstrate that the waiting period constitute[d] an undue burden." Rather, they said:

> [U]nder the undue burden standard a State is permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest. And while the waiting period does limit a physician's discretion, that is not, standing alone, a reason to invalidate it. In light of the construction given the statute's definition of medical emergency . .

16

. ,[13] we cannot say that the waiting period imposes a real health risk.

We also disagree with the District Court's conclusion that the "particularly burdensome" effects of the waiting period on some women require its invalidation. A particular burden is not of necessity a substantial obstacle. Whether a burden falls on a particular group is a distinct inquiry from whether it is a substantial obstacle even as to the women in that group. And the District Court did not conclude that the waiting period is such an obstacle even for the women who are most burdened by it. Hence, on the record before us, and in the context of this facial challenge,[14] we are not convinced that the 24-hour waiting period constitutes an undue burden.

Id. at 886-87.

To repeat, as a declaration of federal constitutional law, Casey does not in any way direct our determination of state constitutional law on this point. But both Casey and the case before us contend that virtually identical state regulations violate women's rights to terminate their pregnancies; Casey found that the regulation was not an undue burden on those rights; if such rights exist under the Indiana Constitution, the regulation would violate them only if it imposed a material burden on them; and as we have held earlier in this opinion, undue burden and material burden are the equivalent of one another.

When the Indiana statute at issue in this case was reviewed by the United States Court of Appeals for the Seventh Circuit, the court (like the Supreme Court in Casey itself) was in the procedural posture of reviewing a District Court judgment that had found, after trial, that the evidence presented by the plaintiffs demonstrated that the two trip requirement imposed an undue burden. The Court of Appeals reversed, concluding that the evidence the District Court found persuasive was not of the character to justify "depart[ure] from the holding of Casey that an informed-consent law is valid even when compliance entails two visits to the medical

---

[13] Indiana has a comparable medical emergency provision. See A Woman's Choice, 305 F.3d at 685-86. Indeed, it may be broader than the Pennsylvania provision. See A Woman's Choice, 671 N.E.2d at 110.

[14] For present purposes, comparing the "material burden" and "undue burden" standards, we do not believe the fact that Casey involved a facial challenge is material.

17

provider." A Woman's Choice, 305 F.3d at 692. The court's reason for reversing was essentially that, while the District Court had relied upon studies showing that the number of abortions in Mississippi and Utah had decreased after the adoption of similar waiting period statutes, those studies did not prove what would happen in Indiana if the waiting period requirement took effect here. Id. at 692. (At the time of the Seventh Circuit's decision, the waiting period requirement had never taken effect because of the District Court's injunction.)

Of value to our analysis here are two other points made by the Seventh Circuit. First, it pointed to the language in Casey quoted above that held that Pennsylvania's waiting period requirement did not impose an undue burden, even assuming that the District Court in Casey had been correct in finding the waiting period requirement to be "particularly burdensome." Id. at 691-92. Second, the Seventh Circuit took the position that, although it acknowledged that it did not have Supreme Court authority for this position and so rested its holding on alternative grounds, in order to assure a nationally uniform approach to enforcing the undue burden standard, "constitutionality must be assessed at the level of legislative fact, rather than adjudicative fact determined by more than 650 district judges." Id. at 688. These two points together form a strong argument that we should assess the constitutionality of the statute based on the language of the statute itself and not on the outcome of the evidentiary hearing ordered by the Indiana Court of Appeals.

Shortly after Casey was decided, a challenge to a similar 24-hour waiting period statute came before the Ohio Court of Appeals. That court concluded that, as a matter of state constitutional analysis, the undue burden test was appropriate. Finding that the challenged Ohio statute was indistinguishable from the Pennsylvania enactment at issue in Casey, it held that there was no basis for concluding that the relevant provisions of the "Ohio Constitution impose[d] greater restrictions upon the state than [were] imposed by the United States Constitution as construed by the plurality opinion in [Casey]." Preterm Cleveland v. Voinovich, 627 N.E.2d 570, 578 (Ohio Ct. App. 1993). The Ohio court went on to say:

> In this case, we are guided by [Casey], which does establish the
> standards under the United States Constitution. Although the state
> is free to apply its own constitution differently from the way the

18

United States Supreme Court determines the federal constitution should be applied, we find no reason under the circumstances of this case to find that the Ohio Constitution confers upon a pregnant woman a greater right to choose whether to have an abortion or bear the child than is conferred by the United States Constitution, as explained in the plurality opinion of [Casey]. Stated conversely, we see no reason for finding that the Ohio Constitution places greater restrictions upon state action than are placed by the United States Constitution as construed in the plurality opinion of [Casey].

Id. at 584.

More recently, the Mississippi Supreme Court decided a similar case. Under the Mississippi Constitution, there is a state constitutional right to privacy that includes "an implied right to choose whether or not to have an abortion." Pro-Choice Miss. v. Fordice, 716 So. 2d 645, 654 (Miss. 1998). To analyze a claim that a 24-hour waiting period requirement violated that constitutional right, the court adopted Casey's reasoning that "'the undue burden standard is the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty. . . . A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'" Id. at 655 (quoting Casey, 505 U.S. at 876-77). In adopting this reasoning, the Mississippi court said:

While we have previously analyzed cases involving the state constitutional right to privacy under a strict scrutiny standard requiring the State to prove a compelling interest, we are not bound to apply that standard in all privacy cases. The abortion issue is much more complex than most cases involving privacy rights. We are placed in the precarious position of both protecting a woman's right to terminate her pregnancy before viability and protecting unborn life. In an attempt to create a workable framework out of these diametrically opposed positions, we adopt the wellreasoned [sic] decision in Casey, applying the undue burden standard to analyze laws restricting abortion. We do not limit any future application of the strict scrutiny standard for evaluating infringement on a person's right to privacy in other areas.

Fordice, 716 So. 2d at 655. The court went on to conclude that the 24-hour waiting requirement did not create an undue burden, in part because it ensured that "a woman has given thoughtful consideration in deciding whether to obtain an abortion." [15]

## IV.

We held that Price's material burden test is the equivalent of Casey's undue burden test, at least for purposes of assessing whether a state regulation violates any fundamental right of privacy that includes protection of a woman's right to terminate her pregnancy that might exist under Article I, Section 1. The analyses of the Supreme Court in Casey and of the Seventh Circuit and the courts in Ohio and Mississippi persuade us that the Indiana statute does not impose a substantial obstacle to a woman's ability to terminate her pregnancy, regardless of any right she may have to do so that is protected by Article I, Section 1. After reviewing the cases discussed above, we hold that Indiana Code § 16-34-2-1.1 would not impose a material burden upon any fundamental right of privacy that includes protection of a woman's right to terminate her pregnancy that might exist under Article I, Section 1, and is, therefore, constitutional.

---

[15] The Tennessee Supreme Court has reached a different result. Like Mississippi, Tennessee recognizes a state constitutional right to privacy that encompasses "a woman's right to obtain a legal termination of her pregnancy . . . ." Planned Parenthood of Middle Tenn. v. Sundquist, 38 S.W.3d 1, 11 (Tenn. 2000). But unlike Mississippi (and the Justices in Casey and the court in Ohio), the Tennessee court found that the abortion right was so similar to constitutionally protected "marriage, child rearing, and other procreational interests," id. at 15, that regulations impinging upon it should be reviewed under a standard of strict scrutiny, not undue burden. Id. In the course of adopting strict scrutiny review, the court sharply criticized the undue burden test as not providing adequate guidance for principled appellate review and invoking Justice Scalia's criticism of it in Casey as being "ultimately standardless." Id. at 16 (quoting Casey, 505 U.S. at 987 (Scalia, J. dissenting and concurring)).

Applying the strict scrutiny test, the Tennesee court found that the State had failed to carry its burden of showing that Tennessee's two-day waiting period requirement was "narrowly tailored to further its compelling interest in maternal health." Sundquist, 38 S.W.3d at 24. The court went on to conclude that "the two-day waiting period has the effect of placing 'a substantial obstacle in the path of a woman seeking an abortion,'" such that it also failed the undue burden test. Id. (citing Casey, 505 U.S. at 878).

## Conclusion

Having previously granted transfer, thereby vacating the opinion of the Court of Appeals, App. R. 58(A), we now affirm the judgment of the trial court.

Shepard, C.J., and Sullivan, J., concur.

Dickson, J., concurs in result with separate opinion.

Boehm, J., dissents with separate opinion.

**Dickson, Justice, concurring in result.**

I would affirm the trial court's dismissal of the complaint, thus reaching the same outcome as the majority opinion, but for different reasons. The majority leaves open the question of whether Article 1, Section 1, of the Indiana Constitution should be interpreted to provide protection for a right to abortion. I prefer this Court to address that question and to explicitly declare that the Indiana Constitution does not protect any alleged right to abortion. In addition, because the challenged statutory pre-abortion requirements not only discourage harm to fetal life, but also protect the health of pregnant women, particularly in light of the risks to women from post-abortion psychological harm, I am convinced that these requirements not only are a proper exercise of legislative power but also are in direct harmony with and furtherance of core values of Article 1, Section 1, of the Indiana Constitution, which declares the inalienable right of "life" and the institution of government for the "peace, safety, and well-being" of the people.

It is important to realize what this case is *not* about. The issue before the Court is not whether abortion is morally right or wrong, or whether it is wise or unwise. These questions are vigorously debated among our citizens. Regardless of one's personal opinion on these issues, the proper resolution of this case is properly grounded on well-established principles of Indiana law.

Central to this case are the opening words of Section 1 in Article 1 of Indiana's 1851 Constitution:

> WE DECLARE, That all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the people; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and
> well-being.

As we have repeatedly emphasized, the interpretation and application of provisions of the Indiana Constitution require

> a search for the common understanding of both those who framed it and those who ratified it. Furthermore, the intent of the framers of the Constitution is paramount in determining the meaning of a provision. In order to give life to their intended meaning, we examine the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our Constitution, and case law interpreting the

1

specific provisions. In construing the Constitution, we look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy.

City Chapel v. South Bend, 744 N.E.2d 443, 447 (Ind. 2001); *see also* Jordan v. Deery, 778 N.E.2d 1264, 1268 (Ind. 2002); McIntosh v. Melroe Co., 729 N.E.2d 972, 974, 986 (Ind. 2000); Ajabu v. State, 693 N.E.2d 921, 929 (Ind. 1998); Bayh v. Sonnenburg, 573 N.E.2d 398, 412 (Ind. 1991).

In Sanchez v. State, this Court emphasized that "courts must be careful to avoid substituting their judgment for those of the more politically responsive branches." 749 N.E.2d 509, 516 (Ind. 2001). Identifying the phrase "all power is inherent in the people" in Section 1 as a "constitutional directive," we found that it "suggests deference to legislation that does not run afoul of a specific constitutional provision." *Id.* As we explained in Baldwin v. Reagan: "In our separation of powers democracy, the constitution empowers the legislative branch to make law. For this reason, every statute stands before us clothed with the presumption of constitutionality unless clearly overcome by a contrary showing." 715 N.E.2d 332, 337-38 (Ind. 1999) (citations omitted). It is clear that "[t]he legislature has wide latitude in determining public policy, and we do not substitute our belief as to the wisdom of a particular statute for those of the legislature." State v. Rendleman, 603 N.E.2d 1333, 1334 (Ind. 1992). "When a statute can be construed to support its constitutionality, such construction must be adopted." Miller v. State, 517 N.E.2d 64, 71 (Ind. 1987).

To support their claim that Section 1 is violated, the plaintiffs present the following line of reasoning: (a) that Section 1 encompasses a right to privacy, (b) that such right incorporates a woman's right to an abortion, (c) that a right to abortion is a core constitutional value that is not subject to governmental regulations that materially burden the right; and (d) that the challenged statutory requirements materially burden the right.

As to the plaintiffs' first two points, it is inconceivable to me that our Constitution's framers intended to create a right to abortion. Beginning in 1835, it was a statutory criminal offense

to perform an abortion.[1]  This statute was in force at the time of the drafting and adoption in 1851 of Indiana's present Constitution including Section 1.  In fact, the people of Indiana, through their elected representatives in the Indiana General Assembly, have continued to consider abortion to be a criminal offense for the past 170 years.[2]

There was no discussion at the 1850-51 Constitutional Convention suggesting or implying any intention to nullify, curtail, or limit this statute.  Significantly, several cases immediately after the adoption of Section 1 involved appeals following convictions for violation of the criminal abortion statute, and none of the resulting opinions even hinted at any concern that the statute violated Section 1 or any other provision in the Indiana Constitution.  Willey v. State, 52 Ind. 421 (1876); Adams v. State, 48 Ind. 212 (1874); Basset v. State, 41 Ind. 303 (1872); Carter v.

---

[1] The 1835 statute, in existence at the time our Constitution was adopted, provided:
[E]very person who shall wilfully administer to any pregnant woman, any medicine, drug, substance or thing whatever, or shall use or employ any instrument or other means whatever, with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman, shall upon conviction, be punished by imprisonment in the county jail any term of time not exceeding twelve months, and be fined any sum not exceeding five hundred dollars.
Ind. Rev. Stat., ch. XXVI, § 3, p. 224 (1838).

[2] Indiana enacted its first abortion statute on February 7, 1835, only nineteen years after Indiana became a State.  See 1835 Ind. Acts ch. XLVII, § 3, in Laws of Indiana 66 (1834-37) (codified at Ind. Rev. Stat. ch. XXVI, § 3, p. 224 (1838), recodified at Ind. Rev. Stat. ch. 53 § 109, pp. 982-83 (1843)).  The law underwent further changes in 1852 and 1859.  See 1852 Ind. Acts § 36 (codified at Ind. Rev. Stat. Vol. II, part 3, ch. 6, § 36, p. 437 (1852)); 1859 Ind. Acts ch. LXXXI, § 2, p. 131 (codified at Ind. Stat. Vol. II, part 3, ch. VII, § XXXVI, p. 469 (1862), recodified at Davis' Indiana Stat., Vol. II, part. 3, ch. 8, § 36 pp. 471-42 (1876)).  In 1881, the law was superseded by an act that raised the penalty from a misdemeanor to a felony and made solicitation of an abortion by the pregnant woman herself a misdemeanor.  See 1881 Ind. Acts, ch. 37, §§ 22, 23, p. 177 (codified at Ind. Rev. Stat. ch. 5, art. 2, §§ 1923, 1924, p. 358 (1881), recodified at Ind. Stat. Vol. I, ch. 5, art. 2, §§ 1996, 1997, pp. 791-92 (Burns 1901), recodified at Ind. Stat. ch. 5, art 2, §§ 2010, 2011, p. 207 (Burns Supp. 1905)).  In 1905, a new criminal code was enacted which essentially restated the prohibitions in the 1881 act.  See 1905 Ind. Acts ch. 169, §§ 367-368, pp. 663-64 (codified at Ind. Stat. ch. 5, art. 2, §§ 2256-2257, pp. 1028-29 (Burns 1908), recodified at Ind. Code §§ 35-1-58-1, 35-1-58-2 (1971)).  After Roe v. Wade, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed 2d 147 (1973), was decided, the legislature amended Indiana's abortion law to permit certain types of abortion.  1973 Ind. Acts, P.L. No. 322 (codified at Ind. Code § 35-1-58.5-1 to -8 (1973)).  Sections 35-1-58-1 and 35-1-58-2, however, were not repealed until 1977, see 1977 Ind. Acts, ch. 335, § 21, and in 1976 this Court upheld the conviction of a woman charged with attempting to procure an abortion in violation of section 35-1-58-1.  Rhim v. State, 264 Ind. 682, 686, 348 N.E.2d 620, 623 (1976).  Even now, Indiana's abortion statute begins by stating "Abortion shall in all instances be a criminal act," but it proceeds to provide limited exceptions authorizing abortions in limited circumstances and generally requiring the woman to file her consent.  Ind. Code § 16-34-2-1(B).  A succeeding statute specifies the matters to be included in a personal medical advisement and requires a delay of at least eighteen hours before the abortion is performed.  Ind. Code § 16-34-2-1.1.

<u>State</u>, 2 Ind. 617 (1851). Clearly, the framers and ratifiers of Section 1 did not intend to recognize a right to abortion, and their intention is of paramount importance.

Furthermore, expansively construing Section 1 to provide abortion rights is directly contrary to two express provisions included in this same Section 1.

First, the text of Section 1 expressly recognizes the inalienable right of "life." Every decision to terminate a pregnancy denies this right to an unborn child. Our present statutory provisions requiring medical information and a slight delay to facilitate thoughtful consideration serve to protect this inalienable right as to fetal life.

Second, in addition to the explicit reference to "life" as an inalienable right in Section 1, the individual rights protected by this section are each also expressly subject to the right and obligation of government to provide for "the peace, safety, and well-being" of its citizens, often referred to as the "police power." The plaintiffs acknowledge that liberty rights under Section 1 are not unlimited, and that such rights "may be intruded upon when there is a valid reason to exercise the police power to do so." Appellants' Brief at 15.

Numerous Indiana cases have emphasized that rights protected by the Indiana Constitution are nevertheless subject to restriction under the police power of the state. *See, e.g.*, <u>Voelker v. Tyndall</u>, 226 Ind. 43, 45-46, 75 N.E.2d 548, 550 (1947) (upholding a statute challenged under Section 1 as "a constitutional exercise of the police power of the state"); <u>State Bd. of Barber Exam'rs v. Cloud</u>, 220 Ind. 552, 572-73, 44 N.E.2d 972, 980 (1942) (stating that liberties are protected by the Indiana Bill of Rights "except as they conflict with the police power"); <u>Kirtley v. State</u>, 227 Ind. 175, 179, 84 N.E.2d 712, 714 (1949) (stating that the inalienable personal liberties under our Constitution are "not to be restricted except perhaps by a proper exercise of the police power of the state"); <u>City of Indianapolis v. Clint's Wrecker Serv., Inc.</u>, 440 N.E.2d 737, 741-42 (Ind. Ct. App. 1982) (recognizing that an enactment that impedes upon the rights of life, liberty, and the pursuit of happiness runs afoul of Article 1, Section 1 "unless it may be sustained as a proper exercise of the police power"); and <u>State ex rel Mavity v. Tyndall</u>, in which this Court emphasized:

Under the police power possessed by every state as a sovereign, the General Assembly

4

was within its rights in enacting the several sections of the questioned statute.  In so do-
ing it exercised that full final power involved in the administration of the law as the

means to the attainment of practical justice upon which the very existence of government depends, as well as the security of the social order, the life and health of the citizen, the enjoyment of private and social life, and the beneficial use of property.

225 Ind. 360, 366-67, 74 N.E.2d 914, 917 (1947).[3]

In numerous ways, Indiana government presently uses its police power to provide for the health and safety of citizens even though it may involve restrictions upon personal freedom with respect to an individual's own body. For example, drivers are required to wear seat belts, Ind. Code § 9-19-10-2 to -2.5; school children must receive immunizations before attending public school, 410 Ind. Adm. Code § 1-1-1 to -4; persons with HIV or hepatitis are required to warn anyone in danger of contacting such viruses, Ind. Code § 16-41-7-1; physicians suspecting certain diseases must report the patient's name and address to local health officials, 410 Ind. Adm. Code § 1-2.3-47; and individuals are prohibited from possessing dangerous drugs and other substances by our criminal code.

By enacting the pre-abortion, in-person counseling requirement and mandatory eighteen-hour waiting period, our legislature has provided important protections for the safety and well-being of pregnant women contemplating an abortion. A considerable body of research recognizes and explores the fact that a significant number of women who voluntarily terminate pregnancies by abortion may suffer serious harmful psychological consequences, with the onset of such distress often delayed until later in life.[4] The reality of such psychological injuries is a

---

[3] Indiana history further confirms the principle that the individual freedoms to which Article 1 refers are subject to reasonable regulation under the state's police power. Conspicuously absent from our present Constitution, which was adopted in 1851, is a provision in Indiana's first Constitution that provided: "To guard against any encroachments on the rights herein retained, we declare, that every thing in this article, is excepted out of the general powers of government, and shall forever remain inviolable." IND. CONST. of 1816, Art. I, § 24. This limitation was not retained in our present Constitution.

[4] *See, e.g.*, D. Bagarozzi, *Post Traumatic Stress Disorders in Women Following Abortion: Some Considerations and Implications For Marital/Couple Therapy*, 1 AM. J. FAM. & MARRIAGE 51-68 (1993); A.N. Broen et al., *Psychological Impact on Women of Miscarriage Versus Induced Abortion: A 2-Year Follow-Up Study*, 66 PSYCHOSOMATIC MED. 265-71 (2004); J.R. Cougle, D.C. Reardon & P.K. Coleman, *Generalized Anxiety Following Unintended Pregnancies Resolved Through Childbirth & Abortion: A Cohort Study of 1995 National Survey of Family Growth*, 19(1) J. ANXIETY DISORD. 137-42 (2005); A.C. Gilchrist et al., *Termination of Pregnancy and Psychiatric Morbidity*, 167 BRIT. J. PSYCHIATRY 243-248 (1995); B. Major et al., *Personal Resilience, Cognitive Appraisals, and Coping: An Integrative Model of Adjustment to Abortion*, 74 J. PERSONALITY & SOC. PSYCHOL. 735-752 (1988); K. McAll & W.P. Wilson, *Ritual Mourning for Unresolved Grief After Abortion*, 80(7) SOUTH MED. J. 817-

strong legislative justification for requiring thoughtful deliberation before undergoing an abortion.[5] The safety and well-being of pregnant women considering abortion are clearly served by legislation assuring they receive vital medical and psychological risk information and have an opportunity to consider the risks before rushing into an irreversible decision that not only will fatally impact fetal life,[6] but also will have a possibly devastating effect upon their own future lives as well. Providing Hoosier women with such relevant risk information enables them to make intelligent choices. But failing to assure dissemination of such information abuses women by depriving them of facts essential to make such decisions.

Our present statutory provisions requiring advisement of medical information and a slight delay to facilitate thoughtful consideration also serve the state's legitimate interest in preserving fetal life. In the exercise of its constitutional responsibility to provide for public welfare, our legislature has explicitly declared Indiana's public policy on this issue: "Childbirth is preferred, encouraged, and supported over abortion." Ind. Code § 16-34-1-1.

The plaintiffs acknowledge that individual liberties may be subject to government regulation to assure public safety and well-being. But they seek exclusion from this principle on the ground that the alleged right to abortion is a core constitutional value, which cannot be materially burdened. In Price v. State, 622 N.E.2d 954, 960 (Ind. 1993), Chief Justice Shepard observed that "in Indiana the police power is limited by the existence of certain preserves of human en-

---

21 (1987); P.G. Ney & A.R. Wickett, *Mental Health & Abortion: Review & Analysis* 14(4) PSYCHIATR. J. UNIV. OTT. 506-16 (1989); D.C. Reardon et al., *Psychiatric Admissions of Low-Income Women Following Abortion and Childbirth*, 168 CMAJ 1253-56 (2003); J.M. Thorp Jr., K.E. Hartmann & E. Shadigian, *Long-Term Physical & Psychological Health Consequences of Induced Abortion: A Review of The Evidence*, 58 (1) OBSTET. GYNECOL. SURV. 67-79 (2003).

[5] Among the information that must be given to a pregnant woman seeking an abortion, Indiana Code § 16-34-2-1.1(a)(1)(C) requires that a physician or physician's assistant advise the woman of "the risks of . . . the procedure." Although it would be preferable for the statute to explicitly include among the required advisements the risks of substantial psychological harm to a woman choosing to have an abortion, the existing language is sufficiently broad to require such information to be provided by physicians. Recognizing that "a woman may suffer long term emotional or psychological injury from making an ill-informed decision to abort a pregnancy," this Court has noted that "[t]he legislature has attempted to ensure that women receive the best information available." A Woman's Choice-East Side v. Newman, 671 N.E.2d 104, 111 (Ind. 1996).

[6] In Humphreys v. Clinic for Women, Inc., 796 N.E.2d 247, 257 (Ind. 2003), this Court recognized that the government's interest in protecting fetal life is a valid legislative justification and that it is not arbitrary or manifestly unreasonable.

7

deavor, typically denominated as interests not 'within the realm of the police power,' upon which the State must tread lightly, if at all." (citations omitted). He then explained: "Put another way, there is within each provision of our Bill of Rights a cluster of essential values which the legislature may qualify but not alienate. A right is impermissibly alienated when the State materially burdens one of the core values which it embodies." *Id.* (citations omitted).

The majority opinion finds it "apparent that if there is a core constitutional value of privacy implicated [under Article 1, Section 1], the purpose for which it is designed is a woman's right to make the ultimate decision to terminate her pregnancy." Slip opin. at 15. But as noted above,[7] even from before the adoption of Indiana's Constitution in 1851, abortion has been considered a criminal offense under Indiana law. Even if we were to imagine that our framers and ratifiers intended Section 1 to protect some aspect of individual privacy, it is historically and logically unacceptable to suppose that they designed such protection for the purpose of assuring a right to abortion.

To the contrary, as previously discussed, there is strong evidence that the framers and ratifiers did not intend to protect a right to abortion, and certainly they did not consider it a core constitutional value. In its decision reversing the trial court, the Court of Appeals asserted its view that the "inalienable rights" clause of Section 1 was intended for the protection of natural rights, and that among these natural rights is "the decision to terminate pregnancy." Clinic for Women v. Brizzi, 814 N.E.2d 1042, 1048-49 (Ind. Ct. App. 2004). But the proposition that a right to abortion is a core value because it is a "natural" right appears self-contradictory. Becoming pregnant after intercourse is natural. Giving birth to the resulting child is natural. Intentionally terminating a pregnancy is unnatural. Procreation is a natural right. Abortion is not.

I believe that the core values of Section 1 do not include the alleged right to abortion, and thus the state's constitutional responsibility and authority to provide for safety and public welfare in matters related to abortion remain undiminished and are not subject to the Price material burden test.

---

[7] *See supra* notes 1-2 and accompanying text.

In addition to the evidence that the creators of Section 1 did not intend to protect a right to abortion, and certainly not as a core constitutional value, consideration of the obvious core values of Section 1 confirm the authority of our legislature to enact the challenged medical advisement and waiting period requirements. Any core values in Section 1 must certainly include the items expressly enumerated: the rights of "life, liberty, and the pursuit of happiness," and the fact that governments are instituted for the "safety and well-being" of its people. By protecting the safety and well-being of pregnant women and discouraging harm to fetal life, the pre-abortion counseling requirement and the mandatory 18-hour waiting period do not burden but rather serve these core values.

Notwithstanding his admonition in Sanchez that "constitutional rights not grounded in a specific constitutional provision should not be readily discovered," 749 N.E.2d at 516, Justice Boehm now urges in his dissent that Section 1 should be expansively construed to provide protection for rights not specifically mentioned in our constitution but related to individual decisions such as whom to marry, whether to have a child, and whether to terminate a pregnancy. But individual liberty in these areas is not absolute and unrestrained. Statutory provisions have long imposed age,[8] consanguinity,[9] multiple spouse,[10] and mental competency[11] restrictions upon eligibility for marriage. And parental rights are subject to restriction and termination by the state when necessary for the health and welfare of affected children.[12]

Justice Boehm's dissent proposes that government should not take sides by enacting legislation regarding matters involving individual conscience and religious belief. But such a proposition could be used to attack the constitutionality of much of our criminal code, particularly laws prohibiting murder, theft, and perjury because these enactments reflect values taught in the Ten Commandments. His argument could likewise be the basis for a challenge to public assistance for the needy, largely an outgrowth of the values of Christian charity, or to legislation seeking racial equality, which resulted substantially from religious movements of the mid-1800s

---

[8] See, e.g., Ind. Code §§ 31-11-1-4, -5.
[9] See, e.g., Ind. Code §§ 31-11-1-2, 31-11-8-3.
[10] See, e.g., Ind. Code §§ 31-11-1-3, 31-11-8-2.
[11] See, e.g., Ind. Code §§ 31-11-4-11, 31-11-8-4.
[12] See, e.g., Ind. Code §§ 31-14-13-4; 31-14-14-1; 31-17-2-17, -18; 31-35-2-1 to -8.

and again in the past fifty years, especially considering the instrumental leadership role of Rev. Dr. Martin Luther King, Jr. and churches and religious adherents galvanized and inspired by his sermons. Legislative enactments should not be invalidated merely because they may foster or coincide with social values deriving from a particular set of religious beliefs or personal convictions.

The opinions of the majority and Justice Boehm disagree on whether the "material burden" test created in Price is essentially equivalent to the "undue burden" or "substantial obstacle" test presented in Planned Parenthood v. Casey, 505 U.S. 833, 876-77, 112 S. Ct. 2791, 2820, 120 L. Ed. 2d 674, 714-15 (1992). Because of my firm conviction that the Indiana Constitution does not recognize or protect any right to abortion, these issues regarding how and whether the material burden test applies do not arise and are unnecessary to address.

In conclusion, while disagreeing with the rationale of the majority opinion, I concur with its result in affirming the trial court's dismissal of the plaintiffs' action. [13]

---

[13] In appealing the trial court's dismissal of their complaint, the plaintiffs contended that the statutory abortion requirements violate three separate provisions of our state constitution: (a) the "inalienable rights" provision, Article 1, Section 1; (b) the "due course of law" provision, Article 1, Section 12; and (c) the freedom of speech provision, Article 1, Section 9. The Court of Appeals rejected the latter two claims but reversed on the first. Clinic for Women, Inc., 814 N.E.2d at 1044-45 n.1, 1053-57. I join the majority opinion in summarily affirming the outcome of the Court of Appeals decision in rejecting the due course of law and free speech claims.

**Boehm, Justice, dissenting.**

For the reasons given below, I respectfully dissent. I believe the Court of Appeals correctly held that the inalienable right to liberty enshrined in Article I, Section 1 of the Indiana Bill of Rights includes the right of a woman to choose for herself whether to terminate her pregnancy, at least where there is no viable fetus or her health is at issue. I also believe the plaintiffs have alleged facts which, if they can be established, show that the statute in question imposes a material burden on the exercise of that right. Accordingly, I agree with the Court of Appeals that the trial court's dismissal of the complaint in this case should be reversed and this case should be remanded for a trial on the merits of the plaintiffs' claims.

### The Inalienable Rights to Life, Liberty, and the Pursuit of Happiness

There is no provision in the Indiana Constitution that adopts verbatim the prohibition found in the federal Fifth and Fourteenth Amendments against the government's depriving a person of "life, liberty, or property, without due process of law." That is, of course, the source of a woman's right to choose an abortion famously declared in Roe v. Wade, 410 U.S. 113, 154 (1973). This does not mean the Indiana Constitution imposes no restraints on legislative incursions into the lives of individual citizens. To the contrary, Article I, Section 1 of the Indiana Bill of Rights is a more straightforward declaration that "all people" have "certain inalienable rights" and that "among these are life, liberty, and the pursuit of happiness." As a textual matter, it is indisputable that this is a stronger affirmation of a right to individual liberty than can be found in the Federal Constitution.

Article I, Section 1 of the Indiana Constitution provides in its entirety:

> **Inherent and inalienable rights.** WE DECLARE, that all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the people; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the people have, at all times, an indefeasible right to alter and reform their government.

1

This language appeared in its current form for the first time in the 1851 Constitution, and for our purposes has remained unchanged since that time. It traces its lineage to the 1816 Constitution, which included a similar, but slightly different declaration of natural rights.[1] Both the 1816 Constitution and the 1851 Constitution affirmed the "liberty" right of all people.[2] Both clearly derived from and tracked the Declaration of Independence,[3] and the source of this language— "the immortal Jefferson"[4]—was repeatedly acknowledged by the delegates to the 1851 Constitutional Convention. It was commonly understood that this language embodied the view that each individual possesses rights derived from natural law, whether grounded in religion[5] or a more secular philosophy.[6]

### Judicial Enforcement of Article I, Section 1 Rights

On its face, the text of Section 1 declares "certain inalienable rights." This language appears, not in a preamble, but as Section 1 of Article I, significantly entitled "Bill of Rights." There can be no doubt other provisions of the Bill of Rights are enforceable by the courts.[7] The

---

[1] Article I, Section 1 of the 1816 Indiana Constitution provided:
> That the general, great and essential principles of liberty and free Government may be recognized and unalterably established; WE declare, That all men are born equally free and independent, and have certain natural, inherent, and unalienable rights; among which are the enjoying and defending life and liberty, and of acquiring, possessing, and protecting property, and pursuing and obtaining happiness and safety.

[2] The 1816 and 1851 versions of Section 1 referred to the rights of all "men." In 1984 this language was changed to all "people," but it is clear from the debates that the vast majority of delegates understood that the term was used "in its general sense" and included women. 1 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana 958 (A. H. Brown ed., 1850) [hereinafter Debates] (Statement of Robert Dale Owen (Dem. Posey)). See also id. at 958 (Statement of John Pettit (Dem. Tippecanoe): "man" as used in Section 1 is "a generic term, embracing the whole human race").

[3] Alexander Stevenson (Whig Putnam), proposing substituting this language, which was ultimately adopted, for the initial proposal by Johnson Watts (Whig Dearborn), described it as "an exact copy of part of the Declaration of Independence." 1 Debates, supra note 2, at 957.

[4] 1 Debates, supra note 2, at 958 (Statement of Robert Dale Owen (Dem. Posey)).

[5] See Michael John DeBoer, Equality as a Fundamental Value in the Indiana Constitution, 38 Val. U. L. Rev. 489, 522 (2004).

[6] For a review of the roots of natural rights as understood in the eighteenth and early nineteenth centuries from the writings of John Locke, John Stuart Mill and others see Armstrong v. State, 989 P.2d 364, 372-73 (Mont. 1999).

[7] The layout of the Indiana Constitution is, first, a preamble, followed by Article I, entitled "Bill of Rights" and enumerating rights of religious freedom, freedom of speech, rights to jury trial, freedom from unreasonable searches and seizures, and several others among the bedrock of American liberties that cannot be infringed by either legislative or executive action. See generally Price v. State, 622 N.E.2d 954 (Ind. 1993).

State does not dispute the principle of judicial review, but contends that Article I, Section 1 of the Indiana Constitution is essentially advisory, or directional, and has no content. I think the text of the Constitution, its history, and precedent all make clear that no vote of a legislative body and no executive action is permitted to deprive the people of those rights. As Justice Jackson eloquently put it:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.[8]

The debates surrounding the adoption of this provision reflect the same view. Delegate William Dunn, in the course of the debates on this section, declared that "the very object of a Constitution is to protect the minority in the enjoyment of their rights—to put a restraint upon the hot blood and the strong arm of the majority."[9] No one disputed that proposition. If the Constitution is to restrain the "hot blood" of the majority, it must identify some rights that the legislature cannot invade, and those rights must be enforceable by the courts, even in the face of legislation.

History also supports the view that these rights are intended to limit legislative discretion and are judicially enforceable. It is noteworthy that the liberty right was first declared in the original Indiana Constitution of 1816, more than a decade after the principle of judicial review of legislation for conformity to the Constitution was established in Marbury v. Madison, 5 U.S. 137 (1803). The current Bill of Rights, including the liberty right, was adopted in 1851, almost a half century after that landmark decision and long after the principle that Indiana courts must hold invalid a statute that violates the State Constitution was well established.[10] At the time the

---

[8] W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638 (1943).

[9] 1 Debates, supra note 2, at 956 (Statement of William Dunn (Whig Jefferson)).

[10] Elwell v. Tucker, 1 Blackf. 285, 286 (Ind. 1823) ("If that act is Constitutional, the judgment must stand; if otherwise, it must be reversed."); Clark v. Ellis, 2 Blackf. 8, 10 (Ind. 1826) ("We have heretofore decided that a part of an act of assembly being unconstitutional, does not affect a constitutional part of the same act relative to the same subject. That part which is unconstitutional, is considered as if stricken out of the act; and if enough remains to be intelligibly acted upon, it is considered as the law of the land.").

current Indiana Constitution was written, the notion that the courts are obliged to strike down legislation that violates a right guaranteed by the Indiana Bill of Rights was well entrenched in Indiana state constitutional jurisprudence.[11] There is no suggestion of dissatisfaction with that principle in the 1851 Convention. To the contrary, the fundamental assumption of the framers was that the ultimate source of legitimate governmental power remained in the people of the state. A written constitution created a limited government, and delegated to the legislature some, but by no means all powers of government. Indeed, shortly after the adoption of the 1851 Constitution, this Court, quoting Federalist No. 68: "[t]he courts of justice are to be considered the bulwarks of a limited constitution," held that the courts should declare void "a law in violation of the natural rights of man."[12]

Moreover, Section 1 is just that—the first section of the Indiana Constitution. And it is not accidentally so. Arguing for retention of the 1816 language that would expressly affirm "natural, inherent, and inalienable rights, among which are the enjoying and defending life and liberty and of acquiring, possessing, and protecting property," Mr. Dunn pleaded "[l]et us give to this sentiment the first place in our bill of rights, that our children and our children's children may early learn it, and cherish it in their hearts as one of the fundamental principles of our government."[13] The version that was finally adopted omitted the express right "of acquiring, possessing, and protecting property," but only after the point was made that the rights would exist whether or not specifically listed in the written Constitution.[14] The courts agreed, finding such a right only five years later.[15]

---

[11] See, e.g., State v. Mead, 4 Blackf. 309 (Ind. 1837) (statute authorizing bench trials violates state constitutional right to jury trial); Rubottom v. M'Clure, 4 Blackf. 505 (Ind. 1838) (statute authorizing commissioners to take land for the Wabash and Erie Canal does not violate the constitutional prohibition against taking property without compensation because of the provision in the statute for compensating the owners).

[12] Madison & Indianapolis R.R. Co. v. Whiteneck, 8 Ind. 201, 212-13 (1856).

[13] 1 Debates, supra note 2, at 957.

[14] Id. at 958 (Statement of Robert Dale Owen (Dem. Posey)). Mr. Owen's point was that other state constitutions also omitted specific reference to the right to acquire property, but that as citizens of the United States, and therefore possessors of the "inalienable rights" expressed in the Declaration of Independence, that right existed whether or not it was listed in the constitution of a state. See also id. (Statement of John B. Howe (Whig Lagrange): "I am not particular whether the section in the original Constitution is retained or not").

[15] Whiteneck, 8 Ind. at 213.

Given this text, structure, and history of Article I, Section 1, it is not surprising that only four years after the adoption of the 1851 Constitution, two decisions of this Court invalidated legislation on the ground that it violated the Article I, Section 1 right to "liberty." In Herman v. State, 8 Ind. 490 (1855) and Beebe v. State, 6 Ind. 501 (1855) this Court struck down statutes prohibiting manufacture or sale of whiskey, ale, porter, and beer. In so doing, this Court found that "the right of liberty and pursuing happiness secured by the constitution, embraces the right, in each *compos mentis* individual, of selecting what he will eat and drink."[16] Over a century later, principally because the due process clause of the Federal Constitution has been the principal source of definition of rights, there have been relatively few occasions for this Court to define or specify the rights guaranteed by Article I, Section 1, but no decision has suggested that there is no content to this provision. To the contrary, several cases have invalidated legislation as a violation of Section 1.[17] To the extent the courts have sustained legislation against a challenge that it restricts individual liberties in violation of Section 1, it has been on the ground that the law reflects a legitimate exercise of the "police power" of the state, and not on the ground that there is no justiciable issue or that the right to life, liberty, and the pursuit of happiness has no content.[18]

---

[16] Herman, 8 Ind. at 499.

[17] See Dep't of Fin'l Insts. v. Holt, 231 Ind. 293, 309, 108 N.E.2d 629, 637 (1952) (invalidating a statute limiting the amount that purchasers of retail installment contracts could agree to pay retail dealers because it was an impermissible exercise of the State's police power under Article I, Section 1); Kirtley v. State, 227 Ind. 175, 179-80, 84 N.E.2d 712, 714 (1949) (statute prohibiting "scalping" of tickets to sports events violates Article 1, Section 1 liberty right which includes freedom of contract); Dep't of Ins. v. Schoonover, 225 Ind. 187, 192-94, 72 N.E.2d 747, 749-50 (1947) (Regulation requiring commissions to be paid on insurance sales impairs liberty right to do business under Article I, Section 1 and is not justified by police power. "The rights guaranteed by Art. 1, § 1, are cherished rights and not to be surrendered lightly."); State Bd. of Barber Exam'rs v. Cloud, 220 Ind. 552, 572-73, 44 N.E.2d 972, 980 (1942) ("The individual's right to engage in a lawful business, to determine the price of his labor and to fix the hours when his place of business shall be kept open, except as they conflict with the police power, are personal privileges and liberties within the protection of [Article I, Sections 1 and 23 of] the Indiana Bill of Rights."); Street v. Varney Elec. Supply Co., 160 Ind. 338, 342, 66 N.E. 895, 896-97 (1903) (invalidating minimum wage legislation for public works projects).

[18] See, e.g., State ex rel. Ind. State Real Estate Comm'n v. Meier, 244 Ind. 12, 19-20, 190 N.E.2d 191, 195 (1963) (licensing requirement for real estate agents is legitimate exercise of police power); Ice v. State, 240 Ind. 82, 86, 161 N.E.2d 171, 173 (1959) (law limiting dentistry practice to licensed dentists is not unconstitutional); Alanel Corp. v. Indianapolis Redevelopment Comm'n, 239 Ind. 35, 52, 154 N.E.2d 515, 524 (1958) (law allowing redevelopment commission to acquire a fee title to property does not violate Article I, Section 1). Sometimes the police power was taken to extremes not likely to be upheld today. See, e.g., Thomas v. City of Indianapolis, 195 Ind. 440, 452, 145 N.E. 550, 554 (1924) (city ordinance prohibiting picketing is a valid exercise of police power).

I conclude that Article I, Section 1 does indeed have substance and is designed to assure all persons in this state "certain inalienable rights" which are enforceable by the courts. As Chief Justice Shepard put it: "[T]here is within each provision of our Bill of Rights a cluster of essential values which the legislature may qualify but not alienate."[19] The issue before this Court is therefore whether the liberty rights of a pregnant woman under the Indiana Constitution include the right to choose an abortion. If there is such a right, the question becomes whether this legislation constitutes a valid state regulation or an unconstitutional alienation of that right.

### The Right to Choose as Incident to the Right to Liberty

There can be no doubt that abortion was a crime in 1851. Presumably it is fair to assume that no delegate to the Convention believed that, by adopting Section 1, the framers were creating a right in pregnant women to choose to terminate their pregnancies. The State argues for a static view of the "inalienable" rights, "among which" are the three listed, and also that there is no "liberty" right to elect an abortion. I think the contention that the liberty rights guaranteed by Section 1 were frozen as of that date is not tenable. In 1851 we had slavery in many states and Article II, Section 5 of the 1851 Constitution denied the right to vote on the basis of race. Married women had no property rights until they were conferred by statute in 1923.[20] Both of these subjects were debated at length in the 1851 Constitution,[21] but both were left in a state that, by today's lights, is wholly incompatible with fundamental principles of ordered liberty. Both today, I submit, are governed by the "evolving"[22] protections affirmed by the Bill of Rights as well as by specific constitutional and statutory provisions.

---

[19] Price, 622 N.E.2d at 960. See also City Chapel Evangelical Free Inc. v. City of South Bend, 744 N.E.2d 443, 450 (Ind. 2001) ("As we held in Price, the police power of the State is limited and may not materially burden one of the core values embodied within each provision of the Bill of Rights of Indiana's Constitution.").

[20] See 1923 Ind. Acts, ch. 63, § 3, pp. 190-91.

[21] See 1 Debates, supra note 2, at 228-242 (rejecting proposal to put the issue to the people and ultimately adopting Article II, Section 5 of the 1851 Constitution, which denied suffrage to "negroes"); 1 Debates, supra note 2, at 561-642 (on proposal to require legislation preventing "negroes" from entering the state or owning property in the state; ultimately Article XIII was adopted providing "no negro or mulatto shall come into or settle in the State, after the adoption of this Constitution"); 2 Debates, supra note 2, at 1183-95, 2012-13 (rejecting proposed right of married women to own separate property).

[22] The term is Chief Justice Shepard's describing the Section 9 right to political speech: "In Price we reviewed the history of constitutional development in Indiana and concluded that implicit in the evolving protection for expression under the Indiana Bill of Rights is the idea that political expression is generally consistent with the goals of the police power." Whittington v. State, 669 N.E.2d 1363, 1369 (Ind. 1996).

It is no answer to say that amendments to the constitutions of the United States and of Indiana have since corrected the former, and statutory changes have dealt with the latter. Fortunately that is the case, and the courts have long since invalidated even the Indiana constitutional provisions as violative of the Federal Constitution. But these examples show that if there were no privileges and immunities clause in the Indiana Constitution, and no Fourteenth Amendment to impose federal due process and equal protection limitations on this state, we would now nonetheless readily conclude that the liberty right in Section 1 renders both of these legal anachronisms unconstitutional invasions of fundamental liberty rights. I therefore disagree that the legal status of abortion in 1851 establishes that there is no present Indiana constitutional liberty right to choose.

It is also noteworthy that the framers of our state Constitution were well aware that the "great principle that all men are created equal" had "not yet fulfilled its destiny, nor will it until universal liberty prevails throughout the earth."[23] This contemplated not only geographic spread of the seeds sown by the American Revolution. It also recognized that full blooming of liberty in the United States was yet to come, and that "the existence of slavery in our country is inconsistent with"[24] the declarations found in Section 1. Despite these then current severe shortcomings, the framers of our Constitution nevertheless adopted the view they attributed to the founders of the United States: in the fullness of time, the issue of slavery would resolve itself and the promise of the Declaration of Independence would be fulfilled. As one Delegate put it: "Our fathers felt this inconsistency, but they boldly proclaimed what they believed to be the true principle of government, trusting that in time slavery would cease to exist."[25] We find other recognition of the potential growth and fleshing out over time of the rights secured by Section 1. Many Delegates reminded the Convention from time to time that the views of the majority of citizens or legislators were transient and shifting, and that "government in this country is

---

[23] 1 Debates, supra note 2, at 957 (Statement of William M. Dunn (Whig Jefferson)).
[24] Id.
[25] Id.

7

founded on the idea that it is created not for the benefit of the *majority*, but for the benefit of *all*."[26]

Delegates expressed the view that some rights were innate and immutable, whether or not they found textual expression in the Constitution.[27]  Finally, the text of Section 1 itself—"among which are life, liberty, and the pursuit of happiness"—reflects an open-ended iteration of the rights conferred, not an exhaustive list.  In sum, there was no common understanding among the framers that the text of the Constitution delimited or constituted an exhaustive listing of the rights conferred upon individual citizens by Section 1.  There is no reason to suppose the people they represented who ultimately ratified the 1851 Constitution had any different view.

As Justice Dickson points out,  my opinion for the majority in Sanchez v. State, 749 N.E.2d 509, 516 (Ind. 2001), observed that "constitutional rights not grounded in a specific constitutional provision should not be readily discovered."  However, as Sanchez also noted "fundamental fairness in judicial proceedings" is constitutionally required, despite the absence of any language directly addressing that issue, and despite the absence of a provision prohibiting the deprivation of liberty without due process of law.  There are therefore some rights that are "assumed and required by our state constitution," even if found in no specific language.  Id. at 515.  That point is largely irrelevant here, because the liberty clause of Section 1 is a specific provision, albeit a vaguely worded one.  It has been held to guarantee to each individual the freedom to contract, the freedom to decide what to eat and drink, and the freedom to engage in lawful businesses.[28]  Though we have  only a few square precedents under the Indiana Constitution as to the specifics embraced within the inalienable liberty right, we  also have some more generalized expressions.  In Matter of Lawrance, 579 N.E.2d 32, 39 (Ind. 1991), Chief Justice Shepard attributed to the framers the belief that the liberty guaranteed by Section 1 "included the opportunity to manage one's own life, except in those areas yielded up to the body politic."  We also have some commentary expressing the view that the rights to life, liberty, and the pursuit of happiness include some more specific rights that have been found to be protected

---

[26] 1 Debates, supra note 2, at 960 (Statement of John B. Howe (Whig Lagrange)) (emphasis in original).
[27] "I hold this to be the true American doctrine, on this subject, that all men, without regard to birth or color, have an inherent right to acquire and enjoy the possession of property, independent of any Constitutional sanction whatever."  1 Debates, supra note 2, at 593 (Statement of Milton Gregg (Whig Jefferson)).
[28] See cases cited in footnote 17.

8

by the Federal Constitution[29] and at least one that has specific guarantees in the Indiana Constitution.[30]  According to one history of our state Constitution, "the specific substantive content of [the Section 1 rights] involves a variety of liberties ranging from privacy to procreation, travel to holding office, entering into contract to practicing religion, and engaging in business practices to voting."[31]

The right to privacy, and the branch of that right that specifically identifies a right to reproductive choice, has been established in the Federal Constitution for several decades.  Over sixty years ago, recognition that "[m]arriage and procreation are fundamental to the very existence and survival of the race" required strict scrutiny of any statute that purported to establish a classification of individuals who might be sterilized.[32]  Justice Harlan, in a 1961 dissent, articulated a right to privacy that ultimately was embraced by the majority in holding unconstitutional a state statute that prohibited use of contraceptives.[33]  As it has evolved, I think the label "right to privacy" somewhat misleadingly describes this bundle of rights.  The fundamental rights now recognized by the Federal Constitution include parent-child relationships,[34] and freedom of choice in marriage,[35] among others.  Many of these rights are less in the nature of rights to be out of the public eye than rights to be free to make one's own decisions on fundamentally protected areas, notably family relations and sex and reproduction.  As such, I believe these rights are more properly described as a bundle of liberty rights than rights to privacy.  Whatever their appellation, ultimately one such right was famously held to invalidate state legislation preventing abortion.[36]

---

[29] See, e.g., Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 851 (1992) (laws and traditions afford constitutional protection to personal decisions relating to procreation, contraception, child rearing, and education); Griswold v. Conn., 381 U.S. 479, 497 (1965) (the Federal Constitution protects the right to marital privacy); Passenger Cases, 7 How. 283, 492 (U.S. 1849) (recognizing that the nature of the Federal Union and the constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the United States uninhabited by statutes, rules, or regulations which unreasonably burden or restrict this movement).

[30] Article I, Section 3 guarantees the right of "free exercise and enjoyment of religious opinions."

[31] William P. McLauchlan, The Indiana State Constitution 33 (G. Alan Tarr ed., Greenwood Press 1996).

[32] Skinner v. Okla., 316 U.S. 535, 541 (1942).

[33] See Griswold, 381 U.S. at 497; Poe v. Ullman, 367 U.S. 497, 522 (1961) (Harlan, J., dissenting).

[34] Troxel v. Granville, 530 U.S. 57, 66 (2000).

[35] Boddie v. Conn., 401 U.S. 371, 374 (1971); Loving v. Va., 388 U.S. 1, 12 (1967).

[36] Roe, 410 U.S. at 154.

These rights to marriage, parent-child relationships, and decisions as to procreation are nowhere to be found in the text of the Federal Constitution. Rather they derive ultimately from what Justice Brandeis presciently described as "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men."[37] The Supreme Court of the United States, first in Griswold v. Connecticut and later in Roe v. Wade, cited the "penumbra" and "emanations" of the federal Bill of Rights and the Civil War Amendments as the source of these fundamental federal constitutional rights.[38] In interpreting the Indiana Constitution, however, we need not resort to inferences to find an express liberty right. As already explained, the Indiana Constitution, adopted six decades after the founding of the United States at a period of strong populist sentiment,[39] is more explicit in its affirmation of individual rights and its limitation of legislative power to intrude into personal affairs. As Professor Baude observed, given the history of this state, it follows that "the constitution's key values are not civility, equality, tranquility, or order, but liberty, opportunity, vigor, and privacy."[40] The framers of the Indiana Constitution were not yet graced with Justice Brandeis's felicitous formulation, but it seems that they would have readily embraced the "right to be let alone" as a fair summary of one incident of what they were getting at in assuring the rights to "life, liberty, and the pursuit of happiness." The "opportunity to manage one's own life," recognized in Matter of Lawrance sounds the same note. Finally, the right under the Indiana Constitution to privacy, albeit the branch protecting one from undue publicity and governmental snooping, has been long recognized, if not frequently litigated.[41]

The State argues that our deference to legislative judgment in other areas applies equally here. It is, of course, true that we have upheld a variety of statutes designed one way or another to regulate businesses, land use, and other activities. Specifically, the State analogizes the plaintiffs' claims here to an effort to resurrect the "now-discredited" notion of substantive due process. To be sure, both the federal and state constitutions were at one time cited as barriers to

---

[37] Olmstead v. United States, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting).
[38] Griswold, 381 U.S. at 484-85; Roe, 410 U.S. at 129.
[39] See generally Donald F. Carmony, Indiana 1816-1850: The Pioneer Period 403-451 (1998) (Chapter 8: "The Jacksonian Constitution of 1851").
[40] Patrick Baude, Has the Indiana Constitution Found its Epic?, 69 Ind. L.J. 849, 854 (1994).
[41] See Voelker v. Tyndall, 226 Ind. 43, 44-45, 75 N.E.2d 548, 549 (1947) (the right of privacy "is a well established doctrine, derived from natural law and guaranteed by both the Federal and State Constitutions").

child labor laws, licensing requirements, etc., all in the name of a liberty right to conduct a business as one chooses. The poster child for this federal doctrine, <u>Lochner v. New York</u>, 198 U.S. 45 (1905), was overruled in <u>West Coast Hotel Co. v. Parrish</u>, 300 U.S. 379, 392 (1937). Some Indiana counterparts are cited in footnote 18. As we observed in <u>McIntosh v. Melroe Co.</u>, 729 N.E.2d 972, 975 (Ind. 2000), the <u>Lochner</u> doctrine is no longer credited. But even as it discarded <u>Lochner</u>, the U.S. Supreme Court was careful to note the potentially significant difference between constitutional constraints on economic regulatory measures and the limits the constitution places on laws affecting minority or individual rights. First in the list of those areas of suspect legislation identified in Chief Justice Stone's famous footnote was the scope of the Bill of Rights.[42] Ultimately, individual rights in family relationships and decisions as to procreation, among others, were recognized as fundamental in federal jurisprudence, and any legislation restricting them is subject to strict scrutiny, usually resulting in its invalidation.[43]

The same considerations that gave rise to the federal recognition of substantive rights to privacy under the due process clause require recognition and enforcement of the more explicit liberty right under the Indiana Constitution. We are not talking here about licensing of some types of business, or restrictions on the use of property based on environmental concerns, both of which are grounded in the generally accepted need for government to provide for the common health and safety, and both, if individual liberty is carried to excess, involve infringing the liberties and perhaps the health and well being of others. In both federal and state jurisprudence, today the only debate is as to the degree or specific means of regulation that is appropriate, and whether it is "reasonably related" to some legitimate state interest.[44] Nor are we dealing with the

---

[42] "There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments, which are deemed equally specific when held to be embraced within the Fourteenth." <u>United States v. Carolene Prod. Co.</u>, 304 U.S. 144, 152 n.4 (1938) (Justice Harlan F. Stone was an Associate Justice at the time this footnote was written. He became Chief Justice in 1941).

[43] <u>See generally</u> 3 <u>Ronald D. Rotunda and John E. Nowak</u>, <u>Treatise on Constitutional Law: Substance and Procedure</u> §18.3 (3d ed. 1999).

[44] <u>See, e.g., Kamerling v. O'Hagan</u>, 512 F.2d 443, 445 (2d Cir. 1975) (firefighter grooming regulation); <u>Miller v. Ackerman</u>, 488 F.2d 920, 922 (8th Cir. 1973) (grooming standards of Marine Corps); <u>Greenlee v. Bd. of Med.</u>, 813 F. Supp. 48, 58 (D.C. 1993) (medical licensing board's actions were not irrational and they were reasonably related to a legitimate state interest); <u>Dep't of Nat'l Res. v. Ind. Coal Council, Inc.</u>, 542 N.E.2d 1000, 1005 (Ind. 1989) (must be a "substantial relation" between land use regulation and legitimate state interest); <u>Meier</u>, 244 Ind. at 20, 190 N.E.2d at 195 (act requiring a real estate broker to procure a license upheld).

situation presented in Melroe, which asserted a constitutional right to a particular remedy or right of action. The power of the legislature to create or abolish civil claims is well accepted, and there is no property or liberty right to any particular form of legal relief beyond what the legislature or the common law choose to make available.

Natural rights provided the philosophical grounding of "inalienable" rights as understood by the framers of both the federal and state constitutions. It does not matter whether today we accept the idea that every person has some rights conferred by a higher power, or consider these rights as inherent in nature, or see them established simply as a matter of choice. Irrespective of the source of these rights, the Indiana Constitution insulates some areas of human activity and guarantees that they are free from interference by the legislature. To the extent it is a matter of choice, the constitution makes that choice for us. The issue, of course, is how to identify the areas of human activity that are within the sphere of the inalienable rights guaranteed by Section 1.

One critical difference between the liberty and property rights historically asserted under the rubric of substantive due process and the liberty rights often associated with a right to privacy is the vast difference in the degree of societal interest in the consequences of one's choices to others. Violations of land use regulations, or environmental controls, or the antitrust laws, or the child labor laws, have direct and sometimes dire effects on the property, health, or well-being of other citizens. The consequences of individual decisions of whom to marry, whether to have a child, and whether to carry a nonviable fetus to term are exclusively, or at least overwhelmingly, personal. To be sure, the sensibilities of some may be offended by the choices of others in selecting a spouse, or a married couple's decision to use or forego contraceptives. But that result is largely due to the varied attitudes towards these matters that are grounded in individual philosophies and religions. Government has no role in seeking to take sides in those debates over matters of conscience. Indeed the constitution is explicit on this point: "No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience." Ind. Const., Art. 1 § 3.

A second perhaps more important difference lies in the nature of the value judgments reflected in the decision, say, to operate a landfill and the decision to bear a child. To be sure, in

12

the view of many, the decision whether to complete a pregnancy involves society's interest in promoting human life, and many others consider the fetus as entitled to the same rights and considerations as any human already. Some have suggested that the attending physicians, other family members, and perhaps others are also entitled to weight in the constitutional balance.[45] But the decision is nevertheless an intensely personal one. The factors that may bear on that decision undoubtedly vary widely from individual to individual. Some will place a high priority on the mental or physical health of the woman herself. Others will assign the greatest significance to the anticipated health of the child. Yet others will give greatest weight to the social or economic consequences of giving birth. And, of course, many consider the intrinsic value they place on a potential, or, as some view it, already realized human life as the dominant consideration. Each of these judgments turns on the degree, if any, to which one considers each of these and other factors to be legitimate and relevant. And every individual's answer to those issues turns pivotally on the philosophical and religious outlook of the individual. The question whether to terminate a pregnancy, indeed each individual's way of approaching and thinking about that decision, therefore ultimately becomes one of personal outlook. As the Montana Supreme Court recently put it:

> The fundamental right to personal and procreative autonomy and, in the broader sense, to individual privacy, prohibits the government from dictating, approving or condemning values, beliefs and matters ultimately involving individual conscience, where opinions about the nature of such values and beliefs are seriously divided; where, at their core, such values and beliefs reflect essentially religious convictions that are fundamental to moral personality; and where the government's decision has a greatly disparate impact on the persons whose individual beliefs and personal commitments are displaced by the State's legislated values.[46]

Of course I do not suggest that because there may be religious underpinnings of moral values reflected in legislation, the liberty right immunizes each individual from society's judgment as to the lawfulness of any given practice. Specifically, contrary to Justice Dickson's suggestion, I think it clear that liberty rights do not include the right to murder, steal, or perjure oneself. There may be religious grounds to oppose these actions, but they are also condemned

---

[45] See, e.g., Casey, 505 U.S. at 852-53 (O'Connor, J., plurality).
[46] Armstrong v. State, 989 P.2d 364, 382 (Mont. 1999).

by virtually all philosophies and criminalizing them reflects a nearly unanimous consensus that does not depend on one's individual outlook.

In sum, this Court has found "core values" enshrined in the Indiana Constitution that cannot be alienated by a "material burden."  As Justice Dickson pointed out in City Chapel, Indiana of 1850 was home to followers of a wide array of religious beliefs and also to many who adhered to no faith.[47]  I believe one of these core values is the right to be free from legislation that restricts individual liberty based on essentially philosophical or religious views as to which there is no general consensus.  In addition to the explicit prohibition against a law that "interferes with . . . rights of conscience," that value is expressed repeatedly throughout the debates, though not in precisely that language.  Most commonly it appears as a desire to protect rights of minorities and concern for the potential tyranny of the majority.[48]  It also appears in the strongly expressed respect for the diversity of opinion on matters of conscience that prevailed in 1851 and remains today.  For that reason, I believe this liberty right is entitled to the greatest deference as an exercise of personal liberty, and conclude that the liberty right guaranteed by the Indiana Constitution includes the right of a pregnant woman to terminate her pregnancy, at least where she carries a nonviable fetus or her own health is at issue.

---

[47]     By 1850, Indiana included a variety of religious communities, including Methodist, Baptist, Presbyterian, Roman Catholic, Quaker, Lutheran, Jewish, United Brethren, and Disciples of Christ.  See generally James H. Madison, The Indiana Way 98-104 (1986).  Professor Madison also observes that many Indiana residents at the time were unaffiliated with any religious congregation, and notes that two of the delegates to the Indiana Constitutional Convention, Robert Dale Owen and John Pettit, were considered "freethinkers."  Id. at 99. The framers' and ratifiers' respect for the variety of religious opinions and practices is underscored by their inclusion in the Bill of Rights of Section 7 ("No person shall be rendered incompetent as a witness, in consequence of his opinions on matters of religion.") and Section 8 ("The mode of administering an oath or affirmation shall be such as may be most consistent with, and binding upon, the conscience of the person, to whom such oath or affirmation may be administered.").

City Chapel, 744 N.E.2d at 449.  Alexander F. Morrison (Dem. Marion), declared himself "no churchman of any sect," 1 Debates, supra note 2, at 853, in successfully opposing a preamble amendment that would read:

We, the people of the Commonwealth of Indiana, acknowledge the gracious Providence of God in bestowing upon us the great and manifold blessings of a Christian civilization, and in particular in vouchsafing to us a condition of society in which the rights, social, political, and religious, conferred by Him on mankind, are recognized and respected; for the protection of these rights, and the establishment of justice, liberty, and the general well-being, do solemnly ordain and establish this.

Id. at 852.

[48] See, e.g., 1 Debates, supra note 2, at 956 (Statement of William Dunn (Whig Jefferson)).

14

**Federal "Obstacles" and Indiana "Burdens" on Liberty Rights**

The majority assumes an Indiana constitutional right to choose an abortion, but finds that the statute imposes no material burden on this right. I do not share either the majority's view of the material burden doctrine or its description of federal jurisprudence. I therefore do not find federal precedent, specifically <u>Planned Parenthood of Southeastern Pennsylvania v. Casey</u>, 505 U.S. 833 (1992), to be helpful in resolving the issue under the Indiana Constitution.

Under Indiana constitutional doctrine, these "core values" cannot be subjected to "material burdens."[49] The "material burden" standard is different from, and more stringent than the federal constitutional test. In <u>Stenberg v. Carhart</u>, 530 U.S. 914 (2000), a majority of the Supreme Court embraced the standard first articulated in Justice O'Connor's plurality opinion in <u>Casey</u>. The federal standard requires a showing that the state law "has the purpose or effect of placing a substantial obstacle in the path" of a person's exercise of a liberty right.[50] <u>Casey</u> involved a Pennsylvania statute very similar to the Indiana statute the plaintiffs challenge. The Supreme Court upheld the Pennsylvania law against a federal constitutional challenge, holding that the test is whether the statute imposed an "undue burden on a woman's ability to make this decision," but explaining that this was "shorthand" for the "substantial obstacle" formulation.[51] Under this formulation, a statute is unconstitutional if either its purpose or its effect is to place such an obstacle. It is not clear whether a purpose without effect is sufficient to render a statute unconstitutional.[52] As a practical matter, legislative motivation, however it is to be ascertained, is obscure and often in the eye of the beholder. Because some proper legislative goal is usually available, the battleground, as in this case, is usually the "effect" branch of this "undue burden" test. And if the statute's purpose is a legitimate one, <u>Casey</u> teaches that the statute must use "reasonable measures."[53] As one commentator put it, the net result of this is that the federal test "turns ultimately not on a factual determination of whether the state has affected the exercise of

---

[49] <u>Price</u>, 622 N.E.2d at 961.

[50] <u>See</u> <u>Stenberg v. Carhart</u>, 530 U.S. 914, 918 (2000) (majority opinion of Justice Breyer, quoting from the plurality opinion of Justice O'Connor in <u>Casey</u>).

[51] <u>Casey</u>, 505 U.S. at 874.

[52] <u>See</u> <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997) (Per curiam for six Justices: "even if we assume" a purpose without effect is sufficient, but finding no effect). <u>Cf.</u> <u>Stenberg</u>, 530 U.S. at 1008 n.19 (Justice Thomas, dissenting and attributing to Justice Ginsberg the view that purpose alone is sufficient, but contending that view is inconsistent with <u>Mazurek</u>).

[53] <u>Casey</u>, 505 U.S. at 877.

private choice, but on a normative assessment of whether the state's imposition on private choice is reasonable."[54]

The Indiana standard is "material burden," not "substantial obstacle," with its ultimate dependence on reasonableness. The difference is significant. As Price explained, in distinguishing the similar "rational relationship" weighing process under federal equal protection jurisprudence: "'Material burden' analysis involves no such weighing nor is it influenced by the social utility of the state action at issue. Instead, we look only at the magnitude of the impairment. If the right, as impaired, would no longer serve the purpose for which it was designed, it has been materially impaired."[55] Because federal jurisprudence is less vigorous in its defense of individual liberty rights, Casey is not persuasive authority under the Indiana Constitution.

**The Claims of "Material Burden" on Liberty Rights**

This case comes to us on appeal from the grant of a motion to dismiss the complaint for failure to state a claim for relief by the courts. Accordingly, we assume the allegations of the complaint are true. If the allegations, even if true, are not enough to state a claim for relief, then the trial court properly dismissed this action. However, if the allegations are sufficient to state a claim, whether the plaintiffs will be able to prove them or not is not before us today and remains a matter for trial.

As explained above, Indiana adopts precisely the mode of viewing these rights that Casey rejected—the Indiana Constitution permits a statute to impair a Section 1 right only if there is no material burden. This is no balancing test. Price initially explained material burden as one that significantly affects the exercise of the right. Whittington v. State, 669 N.E.2d 1363 (Ind. 1996), further explained that a material burden will be found if the expression of the right inflicts "'particularized harm' analogous to tortious injury on readily identifiable private interests."[56]

---

[54] David D. Meyer, Lochner Redeemed: Family Privacy After Troxel and Carhart, 48 UCLA L. Rev. 1125, 1169 (2001).
[55] 622 N.E.2d at 961 n.7. See also City Chapel, 744 N.E.2d at 447 ("The 'material burden' analysis looks only to the magnitude of the impairment.").
[56] Wittington, 669 N.E.2d at 1370.

The Indiana cases that Justice Dickson cites balancing liberty rights against "police power" are remnants of the post-Lochner era where freedom of contract and property disposition were held subject to police power. We have not held that individual core values are subject to any such balancing. To the contrary, as Price teaches, a material burden on a core value is unconstitutional irrespective of its legislative purpose. Indeed, Price itself involved a government action—maintenance of order in the streets—at the center of public safety concerns. Yet public safety concerns were not permitted to override individual liberty if the results placed a material burden on political speech. The constitution's reference to government's deriving its authority from the people does not suggest a balancing test where core values are concerned. It simply reflects a recognition that governments are essential and that the people who ratify the constitution are the ultimate source of power, including the provisions of the constitution that limit the authority of the legislative, executive, and judicial branches. The legislature is not the people. It is a branch of the government created by the people and subject to the limitations imposed by the constitution.

The complaint here alleges, among other things, that this statute requires delay in medical procedures and that health risks and the cost of the procedure both increase as time goes on. It also alleges that the effect of this statute is to cause some women to travel to other states, or to pursue alternatives other than legal abortion, which can cause physical and psychological harm as well as economic loss. Forcing someone to incur a substantial financial burden or forego altogether exercise of the person's right to choose is surely a material burden. If these allegations can be proven, they are sufficient to state a claim that the statute imposes a material burden on the exercise of a woman's liberty right to determine for herself whether to abort a nonviable fetus. The additional requirement that the expression of the right not inflict injury in the nature of a tort is also met. Some would attribute to the fetus a status as an independent individual that would permit characterizing an abortion as a wrong to the fetus. But that assumption is not generally shared. Many disagree, and the views of all are rooted in their individual "matters of conscience." Resolution of that debate is left to each individual by the liberty right recognized by the Indiana Constitution. Accordingly, I agree with the Court of Appeals that the judgment of the trial court dismissing this action should be reversed.

17

Finally, I do not agree with the majority's view that this complaint asserts a facial challenge that requires a showing that there are no factual settings in which the statute may be constitutional. The only instance in which that doctrine has been addressed in Indiana constitutional jurisprudence is Baldwin v. Reagan, 715 N.E.2d 332 (Ind. 1999). That case dealt with the constitutionality of the seat belt requirement. It addressed whether there may be modes of enforcing a statute that are consistent with the constitution. It did not deal with a claim that the statute invaded any core value. It does not, in my view, justify an unconstitutional impact or a material burden on the core rights of some individuals simply because not everyone is affected.

Baldwin relied on federal constitutional authority. 715 N.E.2d at 337 (citing Reno v. Flores, 507 U.S. 292, 301 (1993); United States v. Salerno, 481 U.S. 739, 745 (1987)). As pointed out, the federal constitutional doctrine regarding "overbreadth" has been limited to First Amendment rights. The basic notion is that a statute that may be a valid restriction on speech in some circumstances nonetheless has a chilling effect on the rights of expression on others. Bd. of Airport Comm'rs of the City of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 576 (1987). Moreover, a statute that is broad in its terms but narrowed only by the choice to enforce it opens the door to abuse. Id. The same reasoning applies here. We cannot know who among potential candidates will be significantly deterred by this statute from exercising her rights, but if it is found to impose a material burden as to a significant number of individuals its chilling effect is equally pernicious as an overbroad restriction on speech. There may be issues of standing that preclude some plaintiffs from asserting claims that in effect assert invasions of the rights of others. See, e.g., H. L. v. Matheson, 450 U.S. 398, 407 (1981). But the plaintiffs here are providers, not individuals seeking a declaration as to their status. The providers serve the entire range of potential individual claimants, and as such are not subject to an "overbreadth" deficiency. There may be a de minimis threshold as to which only an individually affected plaintiff can assert a claim. But where, as here, the plaintiffs contend that "many" of the people they seek to serve are affected, they are in my view entitled to a day in court to prove that claim. Otherwise stated, the providers' claim is not "facial." It attacks the statute as they contend it affects them by deterring others from availing themselves of their services.

18